**UNITED STATES of America, Plaintiff,**

**Donny Brurell Buckley and Alycia Marquese Buckley, by their parent and next friend, Ruby L. Buckley, on behalf of themselves and all Negro school age children residing in the area served by original defendants herein, Intervening Plaintiffs,**

**v.**

**The BOARD OF SCHOOL COMMISSIONERS OF the CITY OF INDIANAPOLIS, INDIANA, et al., Defendants,**

**Otis R. Bowen, as Governor of the State of Indiana, et al., Added Defendants,**

**Citizens for Quality Schools, Inc., Intervening Defendant,**

**Coalition for Integrated Education, Amicus Curiae.**

**Hamilton Southeastern Schools, Hamilton County, Indiana, et al., Additional Added Defendants.**

**No. IP 68–C–225.**

United States District Court, S. D. Indiana, Indianapolis Division.

July 20, 1973.

As Corrected Nov. 12, 1973.

Supplemental Opinion Dec. 6, 1973.

William C. Graves, Brian K. Lansberg, U. S. Justice Dept., for the U.S.

John O. Moss, John P. Ward, Indianapolis, Ind., for intervening plaintiffs.

Lawrence McTurnan, Fred S. White, Indianapolis, Ind., for defendants.

Donald Bogard, Asst. Atty. Gen., Indianapolis, Ind., for Otis R. Bowen, Theodore Sendak, Harold H. Negley, and The Indiana State Bd. of Ed.

Charles W. Hunter, Indianapolis, Ind., for Metropolitan School Dist. of Decatur Township.

William O. Schreckengast, Beech Grove, Ind., for Franklin Township Community School Corp.

Lewis C. Bose, William M. Evans, Indianapolis, Ind., for Metropolitan School Dist. of Lawrence Township, Metropolitan School Dist. of Warren Township, and Metropolitan School Dist. of Wayne Township.

Donald A. Schabel, John R. Carr, Jr., John R. Hammond, Indianapolis, Ind., for Metropolitan School Dist. of Perry Township.

H. William Irwin, Terence L. Eads, Indianapolis, Ind., for Metropolitan School Dist. of Pike Township.

Charles G. Reeder, Ben J. Weaver, Indianapolis, Ind., for Metropolitan School Dist. of Washington Township.

Richard L. Brown, Dale K. Little, Indianapolis, Ind., for School City of Beech Grove.

Richard D. Wagner, Indianapolis, Ind., for School Town of Speedway.

Clifford G. Antcliff, Greenwood, Ind., for Greenwood Community School Corp.

William F. Harvey, Indianapolis, Ind., Frank W. Campbell, Carmel, Ind., for Carmel-Clay Schools and Hamilton Southeastern Schools.

Marshall J. Seidman, Indianapolis, Ind., for Mt. Vernon Community School Corp., Plainfield Community School Corp., Avon Community School Corp., Brownsburg Community School Corp., and Eagle-Union Community School Corp.

Stephen A. Free, Michael J. Tosick, Greenfield, Ind., for Greenfield Community School Corp.

David W. Mernitz, Philip S. Kappes, Indianapolis, Ind., for Mooresville Consolidated School Corp.

Harold E. Hutson, Indianapolis, Ind., for Citizens for Quality Schools, Inc.

Lawrence M. Reuben, Indianapolis, Ind., for Coalition for Integrated Ed.

Kitley, Schreckengast & Davis, Beech Grove, Ind., for Center Grove Community School Corp.

LaGrange & Fredbeck, Franklin, Ind., for Clark-Pleasant Community School Corp.

Williams, Cone & Billings, Greenfield, Ind., for Southern Hancock County Community School Corp.

Brunner, Brown & Brunner, Shelbyville, Ind., for Northwestern Consolidated School Dist.

## MEMORANDUM OF DECISION

DILLIN, District Judge.

### I.
### Introduction

This is a school desegregation action originally brought by the United States on May 31, 1968, pursuant to Section 407(a) and (b) of the Civil Rights Act of 1964, 42 U.S.C. § 2000c–6(a) and (b) against The Board of School Commissioners of Indianapolis, Indiana (hereinafter IPS), the members of the Board, and its appointed Superintendent of Schools.

On August 18, 1971, this Court found and concluded that IPS was guilty of unlawfully segregating the public schools within its boundaries. That decision was unanimously affirmed by the United States Court of Appeals for the Seventh Circuit and review was denied by the Supreme Court of the United States, without dissent. United States v. Board of Sch. Com'rs, Indianapolis, Ind., D.C., 332 F.Supp. 655, aff'd 7 Cir., 474 F.2d 81, cert. den., 413 U.S. 920, 93 S.Ct. 3066, 37 L.Ed.2d 1041 (1973). Such issue is res judicata.

In contemplating a remedy to vindicate the rights of Negro school children, this Court concluded that it could have ordered a massive "fruit basket" scrambling of students within IPS to achieve exact racial balancing. But the Court also concluded that in the long run, given the steadily rising percentage of Negro pupils within IPS, the racial composition of IPS would become nearly all Negro because of an acceleration in the departure of white families with children from IPS. In this connection the Court discussed the "tipping-point" factor— the point at which white exodus from a school unit is accelerated by increase of Negro students beyond a certain variable percent, and noted that the tipping-point/resegregation problem would become insignificant if the boundaries of IPS were enlarged to include all of Marion County and a portion of its contiguous metropolitan region. The Court does not consider its conclusions in this area as res judicata.

In order to provide an appropriate adverse setting for further consideration of the legal and practical appropriateness of a metropolitan plan, the Court ordered the plaintiff United States to secure the joinder of necessary parties and seek further relief to determine the answers to certain questions posed by the Court.

On September 7, 1971, the United States (hereinafter the Government), pursuant to such order, moved to add as parties defendant all school corporations in Marion County, other than IPS. The motion was granted. However, the Government failed to assert any claims or seek any relief against such added defendants. A few days later the Buckley plaintiffs filed their petition to intervene in this action in their own right and as representatives of a class consisting of Negro school age children residing in Marion County, Indiana, who are required to attend segregated schools operated by IPS. The petitioners alleged that their interests and those of the class they represented were not being adequately protected by the original plaintiff, the United States, because the Government had failed to seek relief against the added school defendants. The Court granted the petition to intervene on September 14, 1971.

The Buckley intervening plaintiffs (hereinafter plaintiffs) eventually joined as added defendants Edgar D. Whitcomb (since succeeded by Otis R. Bowen), as Governor of the State of Indiana; Theodore Sendak, as Attorney General of Indiana; John J. Loughlin (since succeeded by Harold H. Negley), as Superintendent of Public Instruction of the State of Indiana; The Indiana State Board of Education, and nineteen school corporations within and without Marion County, Indiana (including the ten in-county corporations joined by the Government), as follows:

### Marion County

The Metropolitan School District of Decatur Township (hereinafter Decatur)

The Franklin Township Community School Corporation (hereinafter Franklin)

The Metropolitan School District of Lawrence Township (hereinafter Lawrence)

The Metropolitan School District of Perry Township (hereinafter Perry)

The Metropolitan School District of Pike Township (hereinafter Pike)

The Metropolitan School District of Warren Township (hereinafter Warren)

The Metropolitan School District of Washington Township (hereinafter Washington)

The Metropolitan School District of Wayne Township (hereinafter Wayne)

School City of Beech Grove (hereinafter Beech Grove)

School Town of Speedway (hereinafter Speedway)

### Boone County

Eagle-Union Community School Corporation (hereinafter Eagle)

### Johnson County

Greenwood Community School Corporation (hereinafter Greenwood)

### Hamilton County

Carmel-Clay Schools (hereinafter Carmel)

### Hancock County

Greenfield Community School Corporation (hereinafter Greenfield)

Mt. Vernon Community School Corportion (hereinafter Mt. Vernon)

### Hendricks County

Avon Community School Corporation (hereinafter Avon)

Brownsburg Community School Corporation (hereinafter Brownsburg)

Plainfield Community School Corporation (hereinafter Plainfield)

### Morgan County

Mooresville Consolidated School Corporation (hereinafter Mooresville)

The geographical areas served by IPS and added defendants, with the exception of Greenfield, and Union Township of Eagle-Union, are reflected on Figure 1. Also represented thereon, for reasons which will hereafter appear, are territories or parts of territories served by certain other school corporations bordering on Marion County, namely, Clark-Pleasant Community School Corporation (Clark) and Center Grove Community School Corporation (Grove) of Johnson County; Delaware and Fall Creek Townships, a part of Hamilton Southeastern School Corporation of Hamilton County; Sugar Creek Township, a part of Southern Hancock County Community Schools (Hancock) of Hancock County; and Moral Township, a part of Northwestern Consolidated School Corporation of Shelby County (Northwestern) of Shelby County.

The intervening defendant Citizens of Indianapolis for Quality Schools, Inc., is a not-for-profit corporation whose members are parents of children in IPS. Its initial attempt to intervene in this action, in opposition to the original complaint of the Government, was denied by this Court, although the Court permitted it to attend the original trial, present argument, and file a brief *amicus curiae*. The ruling was appealed and affirmed. United States v. Board of Sch. Com'rs, Indianapolis, Ind., 466 F.2d 573 (7 Cir. 1972). Subsequently, however, intervention was permitted and intervening defendant participated fully in the most recent trial.

Coalition for Integrated Education is an unincorporated association of individuals favoring a metropolitan plan of school desegregation, which filed a petition for leave to appear *amicus curiae* for the purpose of presenting a desegregation plan, and a supplemental motion for leave to file a brief. The names of the members of the association are attached to the original petition. The mo-

tion for leave to file a brief as *amicus curiae* is granted. The Court reserves ruling on the petition to file a plan, as premature.

## II.

### The Issues

The issues of fact submitted for trial are as follows:

1. Whether or not desegregation of IPS within its present boundaries (sometimes referred to as an "Indianapolis Only Plan") can be accomplished as required by the equal protection clause of the Fourteenth Amendment in such a manner as to "work," within the meaning of Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968): "The burden on a school board today is to come forward with a plan that promises realistically to work . . . ."

2. Whether or not any of the added defendant officials of the State of Indiana, their predecessors in office, or the added defendant The Indiana State Board of Education have acted to promote segregation, or failed to carry out duties imposed upon them by law in such a manner as to promote segregation or inhibit desegregation within IPS.

3. Whether or not any of the added defendant school corporations have acted to promote segregation either within IPS or within their own boundaries.

The issues of law presented are as follows:

1. Whether or not the acts of *de jure* segregation heretofore found to have been practiced by IPS can be imputed to the State of Indiana such that appropriate State officials or agencies may be directed to afford relief to vindicate the Fourteenth Amendment rights of plaintiffs and their class.

2. Whether or not appropriate State officials or agencies have the power to direct reorganization of IPS with other school corporations, or to direct the transfer or exchange of IPS pupils to or with other school corporations in order to vindicate such rights.

3. Whether or not this Court may act in the manner just described to vindicate such rights if responsible officials or agencies of the State fail to do so within a reasonable time.

## III.

### Viability of an Indianapolis Only Plan

As stated above, the Court in its original opinion expressed some doubts as to whether or not a stable desegregation plan could be established within the confines of IPS, based upon the evidence adduced at that trial, which was all to the effect that when the percentage of Negro pupils in a given school approaches 40%, more or less, the exodus of white pupils from such a school becomes accelerated and irreversible, resulting in resegregation. However, additional evidence on this issue was adduced at the recent trial, and the Court bases its findings exclusively upon such latter evidence.

Having considered such evidence, the Court finds it to be a fact that when the percentage of Negro pupils in a given school approaches 25% to 30%, more or less, in the area served by IPS, the white exodus from such a school district becomes accelerated and continues, as demonstrated by Figure 2. All witnesses agreed that once a school becomes identifiably black, it never reverses to white, in the absence of redistricting. Therefore, progressions from white to black are irreversible once the critical percentage has been reached in the absence of intervention through redistricting. Below the critical percentage, however, schools tend to remain stable, as demonstrated on Figure 3. With further reference to Figure 3, it will be noted that there is one elementary school within IPS which has remained stable over the past five years with a high degree of integration. This lone exception is School 86, which the Court judicially knows to be located in the Butler-Tarkington area of the city, mentioned in the testimony as an area in which the residents, black and white, have worked together for the past several years in a

community relations program designed to maintain the stability of the neighborhood as an integrated community. The results achieved show dramatically that such a program can be made to work, but unfortunately the other statistics illustrate all too well that the Butler-Tarkington situation is the exception and not the rule.

The Court has no reason to find or believe that a crash IPS-wide community relations program, even if one were in progress (and none is), would achieve a system-wide stabilization in time to preserve the entire system from becoming identified as racially black. The Court further finds that, given the present percentage of Negro pupils in the IPS system, which has risen to 41.1% since the previous trial, and the further fact that black enrollments in IPS will in the near future surpass white enrollments therein, as graphically illustrated on Figure 4, the right of plaintiffs and their class to attend schools which are not racially identifiable, as provided by the equal protection clause of the Fourteenth Amendment, cannot be accomplished within the present boundaries of IPS in a way that will work for any significant period of time.

In other words, it is apparent that as a sheer exercise in mathematics, it would be possible for this Court to order desegregation of IPS on a 58.9%–41.1% basis, or some basis similar thereto, so that no school could, for the time being, be racially identifiable as a black school. As a matter of fact, IPS announced rather dramatically during the recent trial that such a plan would be put into effect for the coming school year, but rejected such plan at its recent meeting of July 16, 1973, as the Court knows judicially. As demonstrated, however, such a plan, if put into effect, would have the effect of an immediate acceleration of white students into suburban white enclaves or private schools, so that IPS as a whole would predictably have a black majority within a matter of two or three years. This is not the Court's idea

of a plan which "promises realistically to work."

On the other hand, the alternative to such a plan is to limit desegregation to figures which are statistically tolerable insofar as "white flight" is concerned, such as to provide that schools which now contain few or no Negro students accept additional numbers of the minority race, not to exceed perhaps 20% to 30%. Such a plan would, of course, have the effect of affording education in a desegregated setting to those minority race students attending schools in which they would make up the minority of 20% to 30%; but considering the total percentage of minority race students in the IPS system, it is equally obvious that such a plan would leave a large number of schools with a minority percentage in excess of 50%, which would not only make them racially identifiable schools, but would once again accelerate white flight from those particular schools.

On this key question as to whether a meaningful desegregation plan could be put into effect within the confines of IPS, the Court heard expert opinions from numerous witnesses called by each side. As usual, they disagreed. However, in the Court's opinion, a clear preponderance of the expert opinion was that no feasible plan could be devised. Those who testified to the contrary tended to qualify their opinions, and in some instances the facts presented by such witnesses simply did not support their conclusions.

For example, Dr. Mercer, a witness called by the Government, testified as to numerous facts having to do with desegregation efforts in the State of California, and presented the City of Riverside as a city where desegregation was apparently working well. However, it developed that the Riverside plan was put into effect voluntarily, accompanied by much community relation effort sponsored by the school and the local news media, and finally that the percentage of minority race students in the entire

system was less than 25%. None of these facts have any relation to the situation in Indianapolis. On the other hand, the witness's own Figure 7, which is the last sheet of Government Exhibit 14, discloses the sharp and dramatic drop in "other-white" students in Inglewood, Pasadena, and San Francisco following public announcement that such schools would be required to desegregate, later followed by the filing of legal actions to accomplish such end. (The term "other-white" in California refers to those persons called "Anglos" in Denver and simply "whites" or "Caucasians" in Indianapolis. The California "other-white" is a white who does not have a Spanish surname.)

The testimony of another defense expert, Dr. Hooker, was completely demolished by cross-examination showing that in his published articles he had expressed views opposite to those given in this case, and Dr. Dodson testified that a metropolitan plan would be superior to one limited to IPS.

The solution, therefore, must be to look elsewhere, if this can be done within the law.

## IV.

*Responsibility of the State of Indiana*

In its previous opinion of August 18, 1971, the Court devoted several pages of its opinion to tracing the history of segregation within Indiana beginning 1800, demonstrating that the State, through its legislative, executive, and judicial branches had practiced all manner of discrimination against Negroes, not only in the field of education, but in housing and innumerable sectors of their social and economic life, as well as in the area of civil rights. 332 F.Supp. pp. 658–665. None of such regrettable history, of which the Court then took judicial notice, has been refuted by any added defendant, with the exception of a quibble about the effect of certain school laws passed in 1961 and thereafter. The Court therefore incorporates such previ-

ous history into this opinion by reference, save to the extent that its discussion of Acts of the General Assembly of 1961 and thereafter will be reviewed further hereafter.

Before entering into a discussion as to the specific acts or omissions of State officials having a bearing on the problems of segregation and desegregation, it seems appropriate at this point to set out in detail the role of the State in public education in Indiana, touched upon rather briefly in this Court's previous opinion.

The original seaboard colonies were, of course, founded in the 17th and 18th Centuries, when the concept of public education was unheard of. As a result, such schools which existed therein in the early days were either church supported or were supported strictly be private funds. The relics of that system linger today in various states which evolved from the original colonies so that, for example, the decision in Bradley v. School Board of City of Richmond, Virginia, 462 F.2d 1058 (4 Cir. 1972), (*"Richmond"*), based its decision reversing an order of the District Court for a metropolitan desegregation plan in Richmond and surrounding counties primarily on the basis that the operation of public schools within the different counties of the Commonwealth of Virginia is a matter of local option, and that, if the option be exercised, the power to operate, maintain and supervise the public schools in a given county is in the exclusive jurisdiction of the local school board and not the state.

However, following the successful conclusion of the Revolutionary War, it was foreseen by the Congress that an educated citizenry was vital to maintaining an enlightened self-government as provided for in the Constitution, and hence the education of all citizens became a concern of the Government. Thus it was that when the Northwest Territory was formed out of lands formerly claimed by the Commonwealth of

Virginia, the Northwest Ordinance of 1787 provided:

"Religion, morality and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." Art. III.

The State of Indiana along with the states of Michigan, Ohio, Illinois, Wisconsin, etc., were, of course, later formed out of the Northwest Territory, and such states accordingly provided by their respective constitutions for the establishment of systems of public education. The original 1816 Constitution of Indiana, Sections 1 and 2, Article 9, paraphrased the above quoted language from the Northwest Ordinance and provided that it should be the duty of the General Assembly to provide by law for a general system of education, ascending in a regular graduation from township schools to a state university wherein tuition would be free, and equally open to all. Article 8, Section 1, of the present Constitution, adopted in 1851, carries forward the duty of the State in the following language:

"Knowledge and learning, generally diffused throughout a community, being essential to the preservation of a free government; it shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement; and to provide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all."

▮ Under the 1851 Indiana Constitution, the common schools as a whole are made a state institution. Ratcliff v. Dick Johnson School Tp., 204 Ind. 525, 185 N.E. 143 (1933); Ehle v. State, 191 Ind. 502, 133 N.E. 748 (1922); City of Lafayette v. Jenners, 10 Ind. 74 (1857). The State owns and maintains the common schools just as it does its public institutions of every kind. State v. Haworth, 122 Ind. 462, 23 N.E. 946 (1890). School corporations within the system only hold title to such schools as trustees and the State has the right to change trustees by annexation at will. Board of School Com'rs v. Center Tp., 143 Ind. 391, 42 N.E. 808 (1896). The legislature may consolidate schools by resolution without notice to the voters or without any referendum or election. Fruit v. Metropolitan Sch. Dis. of Winchester, etc., 241 Ind. 621, 172 N.E.2d 864 (1961).

▮ It was the intention of the framers of the Constitution to place the common schools under the direct control and supervision of the State. Green Castle Township v. Black, 5 Ind. 557 (1854); State v. Eddington, 208 Ind. 160, 195 N.E. 92 (1935). The authority over the schools and school affairs resides exclusively within the dominion of the legislature and the school system is a centralized and not a localized form of school government. Gruber v. State, 196 Ind. 436, 148 N.E. 481 (1925); Jordan v. City of Logansport, 178 Ind. 629, 99 N.E. 1060 (1912); State v. Ogan, 159 Ind. 119, 63 N.E. 227 (1902); State v. Haworth, *supra*; State v. Eddington, *supra.*

▮ Under Article 8 of the Indiana Constitution, the power of the General Assembly to regulate the school system is practically unlimited. Kostanzer v. State, 205 Ind. 536, 187 N.E. 337 (1933). The employees of a school corporation undertake their duties not as officers of local units of self government but as officers of the public school system, which is a State institution. State v. Eddington, *supra.*

▮ The General Assembly has the power to prescribe the terms of the employment contracts to be executed by school corporations, Indiana ex rel. Anderson v. Brand, 303 U.S. 95, 58 S.Ct. 443, 82 L.Ed. 685 (1937), and the power to provide a general system of licenses for those desiring to teach. Stone v. Fritts, 169 Ind. 361, 82 N.E. 792 (1907).

▮ While the State in acting directly to carry out its educational functions under Article 8, Section 1, is not forbid-

den to create and use local corporations for that purpose, it assumes responsibility for the conduct of these corporations. Such corporations were and still are involuntary corporations established as part of the school system of Indiana and are but agents of the State for purposes of administering the State system of education. Indiana ex rel. Anderson v. Brand, *supra*; Campbell v. City of Indianapolis, 155 Ind. 186, 57 N.E. 920 (1900); Freel v. School City of Crawfordsville, 142 Ind. 27, 41 N.E. 312 (1895). Such corporations may only exercise the authority given them by the State, Ratcliff v. Dick Johnson School Tp., *supra*; Ehle v. State, *supra*, and the conduct and practices of these agent corporations must be considered acts of the State. Hummer v. School City of Hartford City, 124 Ind.App. 30, 112 N.E.2d 891 (1953), overruled in part on other grounds, Flowers v. Bd. of Com'rs of County of Vanderburgh, 240 Ind. 668, 168 N.E.2d 224 (1960).

Robinson v. Schenck, 102 Ind. 307, 1 N.E. 698 (1885), held that it was constitutional for the legislature to provide by general law for local school authorities to levy school taxes. Some of the general language in that case could suggest that local school corporations are to be treated as local units of self-government, as in Virginia. To clear up such an implication, the Supreme Court of Indiana in State v. Haworth, *supra*, made it clear that Robinson did not change the relationship of school corporations as agents of the State. The majority opinion specifically rejected the dissenting opinion's argument based on *Robinson* that the school corporations in the State are units of self-government in which local control of the schools is left with the people within such corporation. The majority held instead that the authority and control of schools and school affairs is vested exclusively in the General Assembly and that such affairs are intrinsically matters of State concern and not of a local jurisdiction. "In such matters, the State is a unit, and the legislature the source of power." To

the same effect, see Ft. Wayne Community Schools v. State, 240 Ind. 57, 159 N.E.2d 708 (1959).

To summarize in the words of the court in State v. Mutschler, 232 Ind. 580, 115 N.E.2d 206 (1953):

"The people of Indiana have translated into a fundamental constitutional postulate the belief that the general diffusion of knowledge and learning throughout a community is essential to the preservation of free government, and in harmony with this constitutional postulate the Constitution recognizes that the business of education is a governmental function *and makes public education a function of state government as distinguished from local government. . . .* It was evidently the intention of the framers of the Constitution to place the common schools under the direct control and supervision of the state, and make it a quasi-department of the state government, *a centralized and not a localized,* form of school government." (Emphasis added.)

The Indiana statutes on education are testimony to the constitutional and decisional history just discussed. The Indiana State Board of Education and its predecessor have been given great powers, and "It shall be the duty of the board to coordinate the work of the various commissions so as to bring about an effective and an (*sic*) unified school program and to make determinations in matters of jurisdiction between such commissions in accordance with the law, but all actions of the commissions within their respective jurisdictions shall be final." The "commissions" are on general education, textbook adoption, and teacher training and licensing. Indiana Code 1971, 20–1–1–1 & 20–1–1–2, Burns Ind.Ann.Stat. (hereinafter "Burns") § 28–101, 28–102.

Following said Section 20–1–1 of the Indiana Code of 1971, the first section having to do with schools, there follow some 349 solid pages of statutes enacted by the General Assembly regulating virtually every phase of school operation,

printed single spaced, on unusually wide paper, in a type style reminiscent of that used in the exclusions section of an insurance policy. The annotated version of these laws occupies two complete volumes of Burns, comprising some 1,154 standard pages (but with annotations in small type), exclusive of indices and pocket parts. Burns, Vol. 6, parts 3 and 4. The administrative rules and regulations concerning education consume an additional 126 pages. Burns Ind.Adm. R. & Reg., Title 28. For obvious reasons, the Court will attempt no summary of this vast compendium, except to say generally that all phases of the operation of the public schools are regulated, in one way or another, by the State.

Of particular importance here, however, should be noted the statute, in effect from 1949 until 1972, which vested in the commission on general education of The Indiana State Board of Education the power and duty to regulate new school sites and buildings or any modifications of or additions to existing buildings, and established a division of schoolhouse planning under a director to be appointed by the state superintendent of public instruction with the approval of the governor. IC 1971, 20–1–2–1 to 20–1–2–6, Burns 28–301 to 28–306. Such law was repealed in 1972, but only because it was at such time replaced by a similar law. IC 1971, 20–1–1–6, as added 1972; Burns 28–109 (Pocket supp.).

Questions identical to those presented in this action have been considered by the Court of Appeals for the Sixth Circuit in Bradley et al. v. Milliken et al., 484 F. 2d 215 (1973). In upholding the trial court's determination that a metropolitan remedy would be appropriate to accomplish desegregation of the public schools of Detroit, it based its holding upon discriminatory practices on the part of both the Detroit school board and the State of Michigan found to be "significant, pervasive and causally related" to the segregation in the Detroit school system.

The discriminatory practices of the Detroit school board were, in general, acts of commission identical to those found to have occurred in Indianapolis, such as gerrymandering school attendance zones, making boundary changes which promoted segregation, providing optional attendance zones in "changing" areas, assigning teachers and staff so as to mirror the racial complexion of a school's student body, assigning students to elementary and high schools according to the racial patterns of the feeder schools, selecting sites for new schools and building additions to existing schools in such a fashion as to separate the races, etc.

As between the four discriminatory practices charged to the State, the Sixth Circuit held:

"The clearest example of direct State participation in encouraging the segregated condition of Detroit public schools, however, is that of school construction in Detroit and the surrounding suburban areas. Until 1962 the State Board of Education had direct statutory control over site planning for new school construction. During that time, as was pointed out above, the State approved school construction which fostered segregation throughout the Detroit Metropolitan area . . . . Since 1962 the State Board has continued to be involved in approval of school construction plans."

In the case at hand the evidence shows that Arlington High School was opened in 1961 with a Negro enrollment of 0.23%, Northwest High School was opened in 1963 with a Negro enrollment of 0.0%, and John Marshall High School was opened in 1967 with a Negro enrollment of 0.3%. Inspection of maps in evidence discloses that Arlington is less than a mile from the extreme northeast corner of IPS, Marshall is squarely on the extreme east line of IPS, and Northwest slightly less than a mile from the extreme west line of IPS. This Court found in its previous opinion, and finds once again, that the placement of such schools constituted acts of *de jure* segregation on the part of IPS. The former holding has already been affirmed by the Seventh Circuit, 474 F.2d

at pp. 87, 88. See Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

Here, as in Michigan, the sites for the three high schools mentioned were necessarily approved by the appropriate agencies of defendants The Indiana State Board of Education and the Superintendent of Public Instruction. On the authority of *Bradley*, these were acts of *de jure* segregation on the part of officials of the State. Similar examples could be pointed out with regard to site selection for construction and enlargement of elementary schools, but the foregoing examples are so obvious that there is no need to labor the point.

Further, at all times since 1949, the Indiana statute forbidding racial segregation in educational opportunity has been in effect, IC 1971, 20–8–6–1 et seq., Burns 28–6106 et seq., and the mandate of the Supreme Court of the United States in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), has been the law since 1954. According to the evidence in this case, the officials of the State charged with oversight of the common schools have done almost literally nothing, and certainly next to nothing, to furnish leadership, guidance, and direction in this critical area. Even at this late date, the division of equal educational opportunity of the Indiana Department of Public Instruction, headed by the State Superintendent, consists of but four staff members and a secretary, to cover the entire State of Indiana, and has only been in existence for the past two years pursuant to a Federal grant. The Court finds that the failure of the State Superintendent and the Board of Education to act affirmatively in support of the law was an omission tending to inhibit desegregation.

## V.

### *Acts of Added Defendant School Corporations*

There was no evidence that any of the added defendant school corporations have committed acts of *de jure* segregation directed against Negro students living within their respective borders. In fact, the evidence shows that, with a few exceptions, none of the added defendants have had the opportunity to commit such overt acts because the Negro population residing within the borders of such defendants ranges from slight to none, as illustrated on Figure 5. However, with respect to the added defendants situate within Marion County, the evidence is that when the Marion County School Reorganization Committee, appointed pursuant to the Indiana School Reorganization Act of 1959, IC 1971, 20–4–1–2, Burns 28–3501 et seq., made its initial and unanimous recommendation that all of the school systems in Marion County be merged into one metropolitan system, the added Marion County defendants were unanimous in their opposition to the plan (which was, however, favored by IPS). Subsequently, and for the stated reason that in its opinion the metropolitan plan could not be adopted in view of the suburban opposition, the Reorganization Committee completely reversed itself and proposed a plan which, with minor exceptions having to do with areas within Center Township, froze all existing school corporations in Marion County according to their then existing 1961 boundaries.

Thus school reorganization in Marion County, rather than reorganizing anything except the name and method of school government as to certain added defendants, did nothing at all. By way of contrast, the evidence is that on a state-wide basis reorganizations pursuant to the Act of 1959 ultimately resulted in reducing the number of school corporations by approximately 50%, and created school corporations merging what had formerly been separate corporations in cities, towns, and their adjoining unincorporated areas, as well as merging what had formerly been separate township systems into consolidated systems. Some of the latter mergers extended across county lines, as reflected by defendant Wayne's Exhibit D.

As to IPS, this farcical "reorganization" had the effect of making it technically a reorganized school corporation, and thus hampered its ability to be further reorganized without complying with all of the cumbersome procedures of the 1959 Act and other crippling legislation.

That the added defendants had a legal right to resist the recommendation of the School Reorganization Committee under existing law cannot be denied. At the same time, it is apparent that confining IPS to its existing territory had the effect, which continues, of making it first difficult and now impossible to comply with the law requiring meaningful desegregation.

At this point the Court deems it appropriate to consider briefly the question as to why Figure 5 reflects such a remarkable absence of Negro citizens from the territories of the added defendants with the exception of Washington and Pike (those Negro citizens residing in Wayne are concentrated in that part of Wayne which is within IPS, according to school enrollment figures). · Such absence is particularly glaring under the evidence, which reflects virtually no Negroes in Speedway, which has within its borders Detroit Diesel Allison Division of General Motors Corporation, the largest single employer of labor in Marion County; virtually none in Beech Grove, which houses the shops of the Penn Central Transportation Company; virtually none in Warren outside IPS, although Western Electric, situate in Warren Township, employs thousands of persons who busily make all of the telephones for American Telephone and Telegraph. Equally remarkable is the absence of Negroes from Lawrence, which has the vast Army Finance Center located some two miles east of its high school. Either it must be concluded that Negroes, unlike other citizens, simply do not like to live near their places of employment (and all of the employers mentioned are equal opportunity employers), or there must be some other reason.

In *Richmond* the court said, among other things, "We think that the root causes of the concentration of blacks in the inner cities of America are simply not known . . . ." This Court finds that statement incredible. Although it is undoubtedly true that many factors enter into demographic patterns, there can be little doubt that the principal factor which has caused members of the Negro race to be confined to living in certain limited areas (commonly called ghettos) in the urban centers in the north, including Indianapolis, has been racial discrimination in housing which has prevented them from living any place else.

In the trial just concluded a witness called by the added defendants conceded that Negroes have been severely limited in their search for housing in the Indianapolis area to properties advertised in local newspapers as "for colored," and experts called by the Government testified that discrimination has been a root cause of the black central city phenomenon.

The Court sees no point in laboring the obvious. If racial discrimination did not exist in the United States, Indiana, and the Indianapolis metropolitan area, it would not be necessary to have laws against it. Yet the past ten years have brought forth a spate of such laws, local and national, preceded by reports of investigating commissions without end, all pointing up what every citizen knows —that discrimination is yet with us in a nation which daily pledges that it is ". . . one nation, under God, *indivisible*, with liberty and justice for *all*."

Such racial discrimination, which has been tolerated by the State at the least, and in some instances has been actively encouraged by the State, as set out in this Court's previous opinion, has had, as its end result, the creation of an artificial unrepresentative community, as pictured by the exhibits in this case. At the very least it may be said that Negroes have consistently been deprived of the privilege of living within the terri-

tory of the added defendants by reason of the customs and usages of the communities embraced within such boundaries, and of the State.

The foregoing should not be taken to mean that this action is one having to do with discrimination in housing, and this Court does not consider that a school desegregation action is one in which it is appropriate to attempt to remedy such discrimination, past or present. However, when it may be demonstrated that, as here, the discriminatory customs and usages mentioned have had a demonstrably causal relationship to segregation in the schools, such factor should not be casually swept under the table as in *Richmond*.

## VI.

### Conclusions of Law

The Court concludes, as a matter of law, as follows:

■■■ 1. The acts of *de jure* segregation heretofore found to have been practiced by IPS can be, and are imputed to the State of Indiana.

2. The Superintendent of Public Instruction, The Indiana State Board of Education, and other responsible agents and agencies of the State of Indiana, and the State itself, have each practiced *de jure* segregation, both by commission and omission.

■■■ 3. The General Assembly of the State of Indiana has the power, and it is its duty, to devise a metropolitan plan of common school education in the Indianapolis metropolitan area, which may be to direct the reorganization of IPS with other school corporations, in whole or in part, or to direct the transfer or exchange of IPS pupils to or with other school corporations, in such a manner as to vindicate the Fourteenth Amendment rights of plaintiffs and all Negro children presently within the jurisdiction of IPS to attend desegregated, non-racially identifiable schools.

4. If the General Assembly fails to act in the manner described within a reasonable time, this Court has the power and the duty to devise its own plan, and to order the defendant and the added defendant school corporations, State Superintendent of Public Instruction, and The Indiana State Board of Education to implement the same.

■■■ In short, paraphrasing the holding of the Sixth Circuit in Bradley et al. v. Milliken et al., *supra*, this Court holds that the record establishes that the State has committed *de jure* acts of segregation and that the State controls the instrumentalities whose action is necessary to remedy the harmful effects of the State acts. There can be little doubt that a federal court has both the power and the duty to effect a feasible desegregation plan. Indeed, such is the essence of *Brown II*. Brown v. Board of Education, 349 U.S. 294, 300–301, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). In the instant case the only feasible desegregation plan involves the crossing of the boundary lines between IPS and adjacent or nearby school districts for the limited purpose of providing an effective desegregation plan. The power to disregard such artificial barriers is all the more clear where, as here, the State has been guilty of discrimination which had the effect of creating and maintaining racial segregation along school district lines. United States v. Scotland Neck Board of Education, 407 U.S. 484, 489, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972); Wright v. City of Emporia, 407 U.S. 451, 463, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972); United States v. State of Texas, 447 F.2d 441, 443–444 (5 Cir. 1971); Haney v. County Board of Education of Sevier County, 429 F.2d 364, 368 (8 Cir. 1970). See also Davis v. Board of School Commissioners, 402 U.S. 33, 36–38, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971).

There exists, however, an even more compelling basis for this Court's crossing artificial boundary lines to cure the State's constitutional violations. The instant case calls up haunting memories of the now long overruled and discredited "separate but equal doctrine" of Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138,

41 L.Ed. 256 (1896). If we hold that school district boundaries are absolute barriers to an IPS school desegregation plan, we would be opening a way to nullify Brown v. Board of Education which overruled *Plessy, supra.*

## VII.

### *The Area of a Viable Metropolitan Plan*

In considering a metropolitan plan, it is apparent that, to name a few factors, the area should be reasonably compact in size in relation to its center, should not be separated by massive natural obstacles, and otherwise should be adaptable to the reasonably speedy transportation of school children. Also, it would seem only reasonable to examine whether or not the area to be considered has significant common interests with the area hub. The Court now examines the situation with regard to the area depicted on Figure 1.

In the first place, the Court knows judicially that the entire area consists of virtually flat land, gently sloping from the northeast to the southwest with a fall of approximately 150 to 200 feet in approximately 35 miles. The area contains no natural barriers of any consequence; two fairly sizeable reservoirs, Geist and Eagle Creek, are located northeast and northwest, respectively, and pose no obstacle to movement of people to or from the center of the area, while White River is little larger than a robust creek, and is crossed by numerous bridges. With a very few exceptions, such as added defendants in their roles as employers, all industrial plants and other major places of employment within the area are concentrated either within the boundaries of IPS or are within a few city blocks of such boundaries in Wayne and Warren Townships and the towns of Speedway and Beech Grove. Indeed, as the evidence discloses, many of the added defendant school corporations are the largest single employers of labor within their respective borders! The employment situation is represented on Figure 6, which shows graphically that, with the exception of the City of Greenfield (not shown on Figure 1), more than half (in most cases more than 60%) of the residents of each unit shown on Figure 1 are employed in Marion County—as a practical matter in IPS, or within a few city blocks thereof. If the rather substantial number of workers who did not list their place of employment are distributed in proportion to those who did, it is apparent that the true percentage of Marion County workers in the area is even higher than as indicated.

The employment picture just described results in huge flows of traffic from the "bedroom" townships primarily to Center, Warren and Wayne Townships of Marion County each weekday morning, and back again each evening. In order to accommodate this flow of traffic, the Indianapolis area, with a huge assist from the Federal government, is blessed with an extraordinarily efficient highway network. The central area is completely looped by Interstate Highway I–465, a six-lane, divided, limited access highway, typical of such highways in the Interstate System. The loop varies in its distance from Monument Circle, the hub of downtown Indianapolis, from as little as 4.50 miles, due south, to as much as 11.50 miles to the northwest, averaging perhaps six or seven miles in distance from such central reference point. Additionally there are no less than seven additional legs of Interstate highways branching off of I–465, and in some instances, coming inside the I–465 loop. Specifically, I–74 runs northwest and southeast from I–465, I–69 runs northeast from I–465, I–70 runs southwest and due east from I–465 (with construction in progress to link up both legs through the center of this city), and I–65 runs northwest and southeast from I–465 (I–65 will also link both of its legs through the center of the city, and the north leg is already open from I–465 to 11th and Meridian Streets, in downtown Indianapolis).

In addition, there are many other multilane highways leading into, out of,

and through the central area, many of which are divided, such as S. R. 67 to the southwest and northeast, U. S. 40 due east and west, S. R. 431 and U. S. 31, each running due north and south to southeast, S. R. 37 south and northeast, and S. R. 100, running along the north and east sides, just inside I–465. Such routes, and other main highways, are illustrated on Figure 7.

Virtually all points of interest for cultural, sports, and higher educational activities are located within IPS. For example, as the Court knows judicially, Butler University, Marian College, Indiana Central College, the Indianapolis campus of Indiana and Purdue Universities are so located, as are the Indianapolis Zoo, the Children's Museum, the Indiana State Fairgrounds, the Indiana Capitol and office buildings, all major federal offices, Clowes Hall (an outstanding theater for the performing arts), the Indianapolis Sports Arena, the Indianapolis Convention Center, etc. The Indianapolis Art Museum directly adjoins an IPS boundary, as does the Indianapolis Motor Speedway (located in Speedway).

Just as the working parents of the suburbs drive back and forth to work each day, so are most suburban children bused to and from school. As shown on Figure 8, out of 114,696 students in suburban schools, 90,266 or 78.7% are bused. The State reimburses each school corporation a portion of the cost of busing each child. (Also, it should be noted, the State reimburses each added defendant, except Speedway, a substantial portion of its costs of operation, according to a complicated formula.) These bus routes are extremely time consuming, as anyone knows who has the misfortune to follow a bus down the highway, since the custom in the suburban areas is to pick up the children on virtually an individual basis. However, assuming that children walk to a central school or other convenient point, such as most IPS pupils do, and are then transported non-stop to their designated school of attendance via the major traffic arteries (during which

period of transportation they would be going opposite to the flow of commuter traffic, and hence not impeded by it) the Court is of the opinion that—given logical and most convenient assignments—virtually all students could be delivered in thirty minutes. Thirty or even forty-five minutes is not an unreasonable time, and altogether comparable to that required for such transportation elsewhere in Indiana.

As shown in Figure 4, previously referred to, the white pupil enrollment within IPS is sharply falling, while that of Negro pupils is rising. On the other hand, the population of each area in which added defendants operate their schools, and the areas of non-defendant school districts adjoining Marion County are rapidly rising in population, virtually all white. These changes are illustrated in Figures 9, 10, and 11.

It was argued by added defendants that the Negro birth rate and in-migration had declined to the point where further increase in the black school population would not occur. This not only begs the question of white migration to the suburbs, but cannot be demonstrated statistically, as shown by Figure 12, reflecting that estimated black enrollments in grade 1 in 1973 virtually equal black births in Indianapolis in 1967—an obvious statistical improbability without continued in-migration.

With regard to the defendant Greenfield, Union Township of Eagle-Union and certain omitted townships of the non-defendants Hamilton Southeastern, Southern Hancock, and Northwestern, the Court is of the opinion that the distances involved are impractical, and therefore makes no recommendation that they be included in a metropolitan plan. The Court does recommend that all other added defendants be included in the metropolitan plan, as well as Eagle-Union to the extent of Eagle Township.

The Court observes that, on the basis of the applicable figures, the General Assembly may also wish to add the non-defendants Center Grove, Clark-Pleasant, Southern Hancock, Hamilton Southeast-

ern to the extent of Delaware and Fall Creek Townships, and Northwestern to the extent of Moral Township to the plan. Its ability to do so is undoubted. State v. Mutschler, *supra.* However, the Court can make no finding or recommendation with respect to these corporations until such time as they have had their day in court. Intervening plaintiffs are directed to interplead such corporations as additional added defendants forthwith.

## VIII.

### *Constitutionality of Certain Indiana Statutes*

Questions posed by the Court in its previous opinion inquired as to the constitutionality of certain Indiana statutes, specifically Chapter 186 of the Acts of 1961, IC 1971, 20–3–14–1, 20–3–14–10, Burns 28–2338, 28–2346, 28–2347 (1968 Cum.Supp.); Chapter 52 of the Acts of 1969, IC 1971, 20–3–14–9, Burns 28–2346a (1970 Cum.Supp.), and Chapter 173 of the Acts of 1969, IC 1971, 18–4–1–1 to 18–4–5–4, Burns 48–9101 et seq.

In the opinion of the Court such statutes, along with the application or the misapplication of the School Reorganization Act of 1959, certainly placed IPS in a strait jacket. However, in view of the Court's other findings and conclusions, it is unnecessary to consider the question of unconstitutionality.

## IX.

### *Interim Relief*

The Court is of the opinion that it would be without jurisdiction to order the exchange of pupils between IPS and added defendants at this time. It is Negro children of IPS and not suburban children who are being deprived of a constitutional right, and so long as the various school corporations remain separate the Court believes that it would have no basis to direct that a suburban child be transported out of its own school corporation. However, the Court knows of no reason why added defendants should not immediately accept a reasonable number of Negro children from IPS on a transfer basis, effective as of the beginning of the 1973–74 school year, and it is so ordered. In this connection, the evidence shows that virtually all added defendants routinely exchange or transfer pupils for various educational purposes. The Court can think of no more important form of special education for a Negro child than going to school in an integrated environment.

As shown by the evidence, Negro pupils constituted 39.5% of the 1972–73 enrollment of IPS, but constituted but 24.3% of the total enrollment in Marion County and 19.5% of the total enrollment in the Figure 1 area for the same period. Although a perfect racial balance in each school is not required by law and will not be ordered, the General Assembly will presumably give careful consideration to these relative percentages. Also, the General Assembly should keep in mind that "tokenism" will not, in the Court's opinion, meet constitutional requirements.

With respect to IPS itself, it is not true that children of both races may not be transported or otherwise exchanged. As repeatedly pointed out by this and all other Federal courts in the land, following, as we must, the pronouncements of the Supreme Court of the United States, there is nothing sacred about the attendance zones within a school corporation, no constitutional right in a student to attend a particular school (except that a child of a minority race has a right to attend a desegregated school), and so IPS must immediately take steps to reduce the amount of segregation in its system. However, final relief cannot be had until the General Assembly acts, or this Court is compelled to devise its own plan because of default on the part of the General Assembly.

The Court has given consideration to the average daily attendance in the various schools of added defendants, as shown by the evidence, and is pleased to note that such averages are all well below that permitted by State authorities. If each school accepted transfer of 5% of

its present enrollment, this would amount to an average of little more than one child per classroom, which is certainly a reasonable figure and one well below what the Court believes a proper metropolitan plan should accomplish. However, exceptions should be noted in two instances—that of Pike and Washington.

Washington already has a Negro percentage of 11.29% and Pike a percentage of 8.17%. Washington has an exemplary record of fair treatment of its minority students, and has also aggressively added minority race members to its faculty and staff. Primarily, however, because of their present minority enrollments, transfers to these added defendants should be limited.

It is therefore considered and ordered that, as interim measures, the following be accomplished prior to the beginning of the 1973–74 school year:

1. IPS is directed to transfer to each of the added defendants, except Washington and Pike, a number of Negro students equal to 5% of the total 1972–73 enrollment of each transferee school, respectively, to transfer to Washington 1% of its 1972–73 white enrollment, and to Pike 2% of its white enrollment for the same school year. Provided, however, that the number of students who attended school in Union Township of Boone County for such school year shall be deducted from the Eagle-Union total before applying said percentage.

2. IPS shall not be required to transfer kindergarten students, nor students commencing their twelfth year. The numbers of students in such grades enrolled in added defendants' schools for the year 1972–73 shall, however, be counted in arriving at the total to which the applicable percentage figure shall be applied.

3. Each of the added defendants is directed to accept such transferee students and enroll them accordingly.

4. The cost of transportation and tuition of such students shall be the obligation of IPS; provided, that IPS shall be entitled to a credit for any excess State reimbursement paid to a transferee corporation if any, as a result of the presence of transferred pupils.

5. If any teachers presently employed by IPS are rendered surplus as a result of this order, and additional teachers are needed by any added defendant as a result hereof, first consideration shall be given by such added defendant to employing a qualified IPS teacher.

6. The added defendants and IPS, through their respective boards, superintendents, or other designated agents are ordered to meet together forthwith, and to continue to meet until the various logistical problems made necessary by this order are resolved. Unresolved issues, if any, may be referred to the Court for ruling.

7. IPS is directed to rearrange the enrollment patterns in its elementary schools, effective at the beginning of the 1973–74 school year, such that each school will have a minimum Negro enrollment of in the area of 15%. The pairing or clustering of schools, and realignment of school assignment zones will be employed. Pairing or clustering should be of schools in close proximity, if possible. Such action will result merely in an expansion of the neighborhood or community school concept, and reduce the necessity of busing. If after utilizing such procedures, certain schools do not meet the required numbers, pairing or clustering of schools in non-contiguous zones will be resorted to. *Swann*, 402 U.S. at 28, 91 S.Ct. 1267.

8. If transportation of pupils is required to accomplish the result just ordered, IPS and defendant officials of IPS are instructed that transportation of students of the two races shall be generally proportionate. However, nothing herein should be construed as preventing IPS from closing obsolete, heavily black schools if no longer needed for student housing, and in such event it will necessarily follow, in some cases, that a disproportionate number of black students will require transportation.

9. IPS is further directed to rearrange the feeder patterns of its high

schools, so as to secure enrollment of Negro students in each school more nearly approaching their numbers in the system. Specifically, the number of such students in Thomas C. Howe High School should be increased to the area of 25%, and that at Shortridge reduced to not more than the area of 60%. In making transfers of high school pupils to added defendants, the Board should also keep in mind that Negro percentages at Arlington and Broad Ripple are already somewhat past the 40% level, and should be reduced, if possible.

10. All defendants who have not done so are directed to institute appropriate in-service training courses for their respective faculties and staff, and otherwise to orient their thinking and those of their pupils toward alleviating the problems of segregation.

In this last connection, the Court was pleased to learn from the evidence of the recognition given to Negro students by their fellow white students in the few suburban schools which they attend, and of the honors, both scholastic and otherwise, which such Negro students have earned in such schools. These facts, put in evidence by added defendants, indicate to the Court that children are basically inclined towards judging each other on the merits and that, if permitted to follow their own decent instincts, will accept each other on the basis of equality, without racial hatred. There just may be a message in this evidence for the adult world.

11. John O. Moss and John Preston Ward, attorneys for intervening plaintiffs and their class, are entitled to recover their reasonable attorneys fees and expenses, and intervening plaintiffs are entitled to recover their costs. Such attorneys are directed to submit their respective petitions for fees and allowances. Apportionment of the cost of same is reserved.

12. The Court retains continuing jurisdiction herein.

All of the above is considered ordered, and adjudged this 20th day of July, 1973.

Hamilton
County

Delaware

Boone
County — Eagle (Eagle-Union) — Clay (Carmel-Clay) — Fall Creek (Hamilton-Southeastern)

Brown (Brownsburg) — Pike — Washington — Lawrence — Vernon (Mt. Vernon)

Hendricks County — Lincoln — Buck Creek — Hancock County

Speedway — IPS — Central

Washington (Avon) — Wayne — Warren — Sugar Creek (Southern Hancock)

Guilford (Plainfield) — Decatur — Perry — Beech Grove — Franklin — Moral (Northwestern)

Brown (Mooresville) — Madison — White River (Center Grove) — Greenwood — Pleasant (Clark-Pleasant) — Clark — Shelby County

Morgan County

Harrison — Johnson County

//////////// County Boundary

Scale 0 1 2 3 4 5
 (miles)

Fig. 1

[A8353]

% N/W

Total
Elementary

Increase in Percentage
Negro Students - Rapidly
Changing Schools

Key: A Public Housing Unit Opened 6/69
 B Some Blacks Transferred Out, Whites In 1971
 C Some Blacks Transferred Out, Whites In 1971
 D Two Public Housing Units Opened 12/70

Fig. 2

Fig. 3

Per Cent White - Non-White Students - IPS

Fig. 4

Percent of Negro Residents in Marion
County and Surrounding Townships
(Percent of Negro Students in School Systems)

Fig. 5

Place of work of all workers living in Marion County, School Districts surrounding Marion County, and City of Greenfield. (Source: Plaintiffs' Ex. 37; Carmel-Clay Ex. FF)

| | |
|---|---|
| Marion County | |
| County of Residence | |
| SMSA other than Marion or Residence | |
| Outside SMSA | |
| Not Reported | |

Fig. 6

INDIANAPOLIS
AREA

Fig. 7

[A8359]

Pupils Bused, 1971-72
(Other than Indianapolis)

| | Pupils | Pupils Bused | % Bused |
|---|---|---|---|
| **Boone** | | | |
| Eagle-Union | 1,738 | 1,293 | 74.39 |
| **Hamilton** | | | |
| Hamilton-Southeastern | 1,722 | 1,593 | 92.50 |
| Carmel-Clay | 6,196 | 4,115 | 66.41 |
| **Hancock** | | | |
| Southern Hancock | 1,895 | 1,722 | 90.87 |
| Mt. Vernon | 1,826 | 1,483 | 81.21 |
| Greenfield-Central | 4,156 | 1,733 | 41.69 |
| **Hendricks** | | | |
| Avon | 2,129 | 2,045 | 96.05 |
| Plainfield | 3,731 | 1,714 | 45.93 |
| Brownsburg | 3,333 | 2,198 | 65.94 |
| **Johnson** | | | |
| Clark-Pleasant | 2,738 | 2,533 | 92.51 |
| Center Grove | 2,920 | 2,754 | 94.31 |
| Greenwood | 3,383 | 2,766 | 81.76 |
| **Marion** | | | |
| Decatur | 4,706 | 4,304 | 91.45 |
| Franklin | 2,646 | 2,378 | 89.47 |
| Lawrence | 9,625 | 7,806 | 81.10 |
| Perry | 13,254 | 10,143 | 76.52 |
| Pike | 3,199 | 2,999 | 93.74 |
| Warren | 10,202 | 9,255 | 90.71 |
| Washington | 15,675 | 12,115 | 77.28 |
| Wayne | 12,652 | 11,175 | 88.51 |
| Beech Grove | 2,818 | 1,757 | 62.34 |
| Speedway | 2,482 | 0 | 0.00 |
| **Morgan** | | | |
| Mooresville | 3,959 | 2,286 | 57.74 |
| **Shelby** | | | |
| Northwestern | 1,867 | 1,832 | 98.12 |
| Total | 114,696 | 90,266 | 78.70% |

Source: Reports A and F of
 Plaintiffs' Exhibit 10

Fig. 8

Marion County Township Populations 1940-1970

Fig. 9

Percent Increase in Population: Marion County Townships

Fig. 10

Percent Increase in Population: Outside Marion County School Districts

Fig. 11

1222

Fig. 12

## SUPPLEMENTAL MEMORANDUM OF DECISION

### I. *Introduction*

Heretofore, on August 18, 1971, the Court filed herein its Memorandum of Decision, incorporating its findings of fact and conclusions of law, and making certain interim orders, with respect to the issues presented by the complaint of the original plaintiff, United States of America, and the answer of the original defendants, The Board of School Commissioners of the City of Indianapolis, the individual members of such Board, and the Board's appointed Superintendent of schools. Such decision, which will be referred to hereafter as *"Indianapolis I,"* is reported in D.C., 332 F.Supp. 655, aff'd, 474 F.2d 81 (7 Cir. 1973), cert. den., 413 U.S. 920, 93 S.Ct. 3066, 37 L.Ed.2d 1041 (1973).

Thereafter, on July 20, 1973, the Court filed herein a second Memorandum of Decision, incorporating its findings of fact and conclusions of law, and making certain interim orders, with respect to certain issues presented by the complaint of the original and added plaintiffs, Donny Brurell Buckley, et al. and the answers of the original and added defendants. Such decision will be referred to hereafter as *"Indianapolis II,"* is reported ante, p. 1191, 37 Ind.Dec. 524, and is now on appeal to the Court of Appeals for the Seventh Circuit, Nos. 73–1968 to 73–1984, incl.

The key decision made in *Indianapolis I* was that the Indianapolis public school system (hereafter "IPS") was being operated by the original defendants, and had been operated by their predecessors in office, as a system practicing *de jure* segregation of students of the Negro race. It was therefore held that the Negro students were being denied the equal protection of the laws, as guaranteed by the Fourteenth Amendment. Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Certain interim measures tending to prevent further segregation were ordered, pending consideration of the questions to be presented and later decided in *Indianapolis II*, it being understood that the law required the defendants to take affirmative action to desegregate IPS. Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968).

The key decisions made in *Indianapolis II* were that (1) as a practical matter, desegregation promising a reasonable degree of permanence could not be accomplished within the present boundaries of IPS, and (2) added defendant officials of the State of Indiana, their predecessors in office, the added defendant The Indiana State Board of Education, and the State itself have, by various acts and omissions, promoted segregation and inhibited desegregation within IPS, so that the State, as the agency ultimately charged under Indiana law with the operation of the public schools, has an affirmative duty to desegregate IPS.

The Court also held in *Indianapolis II* that IPS could be effectively desegregated either by combining its territory with that of all or part of the territory served by certain added defendant school corporations, into a metropolitan system or systems, and then reassigning pupils within the expanded system or systems thus created, or by transferring Negro students from IPS to added defendant school corporations, either on a one-way or an exchange basis. It further held that the State, through its General Assembly, should be first afforded the opportunity to select its own plan, but that if it failed to do so within a reasonable time, the Court would have the power and the duty to promulgate its own plan, and place it in effect. Bradley et al. v. Milliken et al, 484 F.2d 215 (6 Cir. 1973). See Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

By way of affirmative relief pending action by the General Assembly, the Court ordered IPS to effect pupil reassignments for the 1973–74 school year sufficient to bring the number of Negro pupils in each of its elementary schools to approximately 15%, which has been ac-

complished. The Court also directed IPS to transfer to certain added defendant school corporations, and for such corporations to receive and enroll, a number of Negro students equal to 5% of the 1972–73 enrollment of each transferee school, with certain exceptions. This order was, on August 8, 1973, stayed by the Court until the 1973–74 school year by an order made in open court but not previously reduced to writing.

At this time, certain matters have been presented to the Court, both formally and informally, which require further rulings in the premises. Such rulings are now made, as hereafter set out, as supplementary to or, in some instances, in lieu of rulings heretofore entered in *Indianaolis II*, as heretofore modified.

## II. The Question of a "Reasonable Time" for State Action

As stated, it was the Court's conclusion that the State should be afforded the opportunity, for a reasonable period of time, to discharge its affirmative duty to desegregate IPS. The question has arisen as to how long a time is reasonable.

As the Court knew judicially at the time it entered its decision in *Indianapolis II,* the General Assembly was scheduled to organize in November, 1973, for a session to begin in early January, 1974. It has so organized, and numerous bills have already been introduced—none, to the Court's knowledge, having to do with the subject at hand. As the Court also knows judicially, various legislative leaders have publicly announced that the coming session is expected to be short, and targeted for conclusion within a matter of a month or so.

Under the circumstances, considering the urgency of the problem presented, the fact that members of the General Assembly have had since July 20, 1973 to consider the problem, and the anticipated length of the coming legislative session, the Court considers a reasonable time within which the General Assembly should act to be the end of its January,

1974 session or February 15, 1974, whichever date is sooner. The Court also considers that any legislation adopted by the General Assembly on the subject of the desegregation of IPS should be effective for the 1974–75 school year.

## III. The Duty of the General Assembly

In its opinion in *Indianapolis II*, the Court pointed out in section IV thereof that the ultimate responsibility for the operation of all public schools in Indiana lies in the General Assembly, and that it has the undoubted power to desegregate IPS by appropriate legislation, citing the Indiana Constitution and some twenty cases decided by the Indiana Supreme and Appellate Courts. It also held that it was the General Assembly's duty to do so, based upon its findings from the evidence that it is not possible for the IPS School Commissioners to bring about a lasting desegregation within IPS boundaries.

In reviewing that opinion, it now occurs to the Court that it perhaps placed undue stress on the General Assembly's power, and not enough on its duty; this failure of direction on the part of the Court may account for the General Assembly's seeming lack of attention to the problem to date, as the Court has no reason to doubt that the able members of that body will do their sworn duty to support the Constitution, once that duty is more clearly defined. By "sworn duty," the Court of course refers to the oath taken by each member of the General Assembly pursuant to Article 6, Clause 3 of the Constitution of the United States, which reads, in applicable part, as follows:

". . . (T)he Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; . . ."

As to what that duty entails, in this instance, may be best ascertained by the guidelines laid down by the Supreme

Court of the United States, whose decisions and interpretations of the Constitution are final and binding on all citizens, including elected and appointed public officials, unless thereafter changed by that Court or by Constitutional amendment. Marbury v. Madison (U.S.) 1 Cranch 137, 2 L.Ed. 60 (1803). It is such guidelines which this Court has endeavored to follow to date in this rather difficult case—not because of any personal views of the Court, but for the simple reason that they constitute the law of the land, in every State and Territory, and the Court, pursuant to its own oath, may do no less. These guidelines, expressed in direct quotation from significant opinions of the Supreme Court, are as follows:

> "Does segregation of children in public schools solely on the basis of race, even though the physical facilities and other 'tangible' factors may be equal, deprive the children of the minority group of equal educational opportunities? We believe that it does. . . .

> "We conclude that in the field of public education the doctrine of 'separate but equal' has no place . . . Plaintiffs . . . are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment. . . ." Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (Brown I)

> ". . . (T)he courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems. . . ." Brown v. Board of Education of Topeka, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (Brown II)

> ". . . (T)he members of the School Board and the Superintendent of Schools are local officials; from the point of view of the Fourteenth Amendment, they stand in this litigation as the agents of the State. . .

> \* \* \* \* \* \*

> "Article 6 of the Constitution makes the Constitution the 'supreme Law of the Land.' . . . (T)he federal judiciary is supreme in the exposition of the law of the Constitution. . . . It follows that the interpretation of the Fourteenth Amendment enunciated by this Court in the Brown Case is the supreme law of the land, and Art 6 of the Constitution makes it of binding effect on the States " 'any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.' Every state legislator and executive and judicial officer is solemnly committed by oath taken pursuant to Art. 6, cl. 3, 'to support this Constitution.' . . . No state legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it. . . ." Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5, 19 (1958)

> "Delays in desegregating school systems are no longer tolerable." Bradley v. School Board of Richmond, 382 U.S. 103, 86 S.Ct. 224, 15 L.Ed.2d 187 (1965)

> "The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work *now*.

> \* \* \* \* \* \*

> "The obligation of the district courts . . . is to assess the effectiveness of a proposed plan in achieving desegregation. . . . The matter must be assessed in light of the circumstances present and the options available in each instance.

> \* \* \* \* \* \*

> " ' "Freedom of choice" is not a sacred talisman; it is only a means to a constitutionally required end—the aboli-

tion of the system of segregation and its effects. . . . (I)f it fails to undo segregation, other means must be used to achieve this end.'" Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968)

"We do not hold that 'free transfer' can have no place in a desegregation plan. But like 'freedom of choice,' if it cannot be shown that such a plan will further rather than delay conversion to a unitary, non-racial, nondiscriminatory school system, it must be held unacceptable." Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968)

"Nearly 17 years ago this Court held, in explicit terms, that State-imposed segregation by race in public schools denies equal protection of the laws. At no time has the Court deviated in the slightest degree from that holding or its constitutional underpinnings.
. . .

\* \* \* \* \* \*

"The objective today remains to eliminate from the public schools all vestiges of state-imposed segregation.
. . .

"If school authorities fail in their affirmative obligations under these holdings, judicial authority may be invoked. Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.

\* \* \* \* \* \*

"The school authorities argue that the equity powers of federal district courts have been limited by Title IV of the Civil Rights Act of 1964, 42 USC § 2000c. The language and the history of Title IV shows that it was enacted not to limit but to define the role of the Federal Government in the implementation of the Brown I decision.
. . .

\* \* \* \* \* \*

". . . The proviso in § 2000c–6 is in terms designed to foreclose any interpretation of the Act as expanding the *existing* powers of federal courts to enforce the Equal Protection Clause. There is no suggestion of an intention to restrict those powers or withdraw from courts their historic equitable remedial powers. . . .

\* \* \* \* \* \*

". . . Bus transportation has been an integral part of the public education system for years. . . . Eighteen million of the Nation's public school children . . . were transported to their schools by bus in 1969–70 in all parts of the country.

". . . The District Court's conclusion that assignment of children to the school nearest their home serving their grade would not produce an effective dismantling of the dual system is supported by the record.

"Thus the remedial techniques used in the District Court's order [pairing, busing, etc.] were [well] within that court's power to provide equitable relief. . . ." Swann v. Charlotte-Mecklenburg Bd. of Ed., 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971)

"As we have held, 'neighborhood school zoning' . . . is not the only constitutionally permissible remedy; nor is it per se adequate to meet the remedial responsibilities of local boards. Having once found a violation, the district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation. A district court may and should consider the use of all available techniques including restructuring of attendance zones and both contiguous and noncontiguous attendance zones. . . .

The measure of any desegregation plan is its effectiveness.

"On the record before us, it is clear that . . . inadequate consideration was given to the use of bus transportation and split zoning. . . ." Davis v. Board of School Commrs., 402 U.S. 33, 91 S.Ct. 1289, 28 L.Ed.2d 577 (1971)

"Just as the race of students must be considered in determining whether a constitutional violation has occurred, so also must race be considered in formulating a remedy. To forbid, at this stage, all assignments made on the basis of race would deprive school authorities of the one tool absolutely essential to fulfillment of their constitutional obligation to eliminate dual school systems.

"Similarly, the flat prohibition against assignment of students for the purpose of creating a racial balance must inevitably conflict with the duty of school authorities to disestablish dual school systems. . . . (T)he Constitution does not compel any particular degree of racial balance or mixing, but when past and continuing constitutional violations are found, some ratios are likely to be useful starting points in shaping a remedy. . . .

"We likewise conclude that an absolute prohibition against transportation of students assigned on the basis of race, 'or for the purpose of creating a balance or ratio,' will similarly hamper the ability of local authorities to effectively remedy constitutional violations. . . . (B)us transportation has long been an integral part of all public educational systems, and it is unlikely that a truly effective remedy could be devised without continued reliance upon it." North Carolina Bd. of Ed. v. Swann, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971)

IV. *Guidelines of this Court—General*

 It is, of course, recognized by the Court that it cannot issue a positive order to the General Assembly to enact specific legislation. It is for such reason that the Court has suggested several different methods by which the General Assembly could approach the problem of effectively desegregating IPS, and it does not imply that there may not be other equally effective methods which may occur to that body.

Within the context of what has been suggested as possible alternatives, however, the Court offers further observations, as follows:

(1) With respect to the concept of one metropolitan school district, embracing the area designated in Figure 1, attached to the Court's opinion in *Indianapolis II*, it is apparent that some advantages would be obtained from such a system. To name a few, a uniform tax base would be provided for the education of the more than 200,000 pupils in the combined system, and economy in operation could be achieved through central purchasing and reduction of administrative overhead. Complete desegregation would be simplified. On the other hand, it may be that such a system would be too large in terms of difficulty of administration and remoteness of the central office from school patrons.

(2) With respect to the concept of creating various new metropolitan districts —for example, six or eight to replace the present twenty-four pictured on Figure 1, it is apparent that some of the advantages above noted would be reduced, and some of the disadvantages improved. Another alternate, of course, would be to create one metropolitan system for taxing purposes, which in turn would be subdivided into several semi-autonomous local districts. So long as IPS and the local districts are each effectively desegregated, the method used would be constitutionally immaterial.

 (3) With respect to the concept of permitting the present school corporations shown on said Figure 1 to remain as is, insofar as geography and control is concerned, such a solution would of

course preserve local autonomy, and this Court would have no reason to disapprove such a solution, so long as each such corporation is required to participate in the desegregation of IPS. Put in other terms, local autonomy for such corporations is, under the law of Indiana, a privilege—not a right—all as discussed in detail in *Indianapolis II*. The consideration for permitting the various corporations to continue their separate existences might therefore be stated to be their participation in a meaningful plan to desegregate IPS. Some of the pertinent facts which the General Assembly may wish to consider in this regard are set out in the next two sections hereof.

### V. *Transfer of Pupils*

When speaking of the transfer of pupils, the first logical question is as to the numbers involved. In this connection, the focus must be on the elementary schools within IPS which were not affected by the interim plan adopted by the Court for the present school year, and which have an enrollment of Negro pupils exceeding 80%. There are nineteen such schools, fourteen of which have Negro enrollments in excess of 97%. Two additional schools have enrollments exceeding 60%, and should also be considered. The total enrollment of black students in these 21 schools, excluding kindergarten and special education students, is approximately 11,500.

The General Assembly might order the exchange of all or a substantial part of these 11,500 students with students from the suburban school corporations. For purposes of illustration, if it were determined to desegregate such schools on the basis of approximately 85% white—15% black, then about 9,775 black children would need to be transferred to suburban schools, and about the same number of non-black children would need to be transferred to IPS.

There is case law to the effect that transfers of students must be made on an approximately equal basis insofar as the races are concerned, unless there is good reason why this should not be done. In such cases it has been held that to impose the "burden" of being transported wholly or largely upon students of one race is yet another form of racial discrimination and in violation of the Fourteenth Amendment rights of the group transported. United States v. Texas Education Agency, 467 F.2d 848 (5 Cir. 1972); Lee v. Macon County Board of Education, 448 F.2d 746 (5 Cir. 1971); Haney v. County, Board of Education of Sevier County, 429 F.2d 364 (8 Cir. 1970). Such cases, if followed, would seem to mandate so-called "two-way" busing, absent compelling reasons to the contrary.

The Supreme Court has not specifically addressed itself to this question. However, it is worthy of note that in McDaniel v. Barresi, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971), that Court approved a desegregation plan adopted by the Clarke County (Ga.) Board of Education which reassigned pupils in five heavily Negro " 'pockets' " to other attendance zones, busing many of them, without any corresponding busing of whites. Other "one-way" busing plans have likewise been approved, depending on the factual setting. Hart v. County School Board, 459 F.2d 981 (4 Cir. 1972); Norwalk Core v. Norwalk Board of Education, 423 F.2d 121 (2 Cir. 1970). Indeed, the Fourth Circuit has flatly held that a pattern of assigning Negro students to formerly all-white schools, without requiring similar travel on the part of whites, does not violate the equal protection clause of the Fourteenth Amendment. Allen v. Asheville City Board of Education, 434 F.2d 902 (4 Cir. 1970). Moreover, analysis of the cases cited in the preceding paragraph indicates that they have been decided on their particular facts, even though some of the language is in terms of absolute requirements.

The Court does not find it necessary to attempt to resolve this question in terms of constitutional absolutes, nor

could it appropriately do so on the present record, since the question has not been squarely presented. However, the record does contain undisputed evidence that virtually all of the twenty-one IPS elementary schools above referred to (located as shown on Figure 13, attached) are substantially out of line with the requirements of present Indiana law and regulations establishing minimum acreage requirements for elementary schools. The regulations require seven acres for schools with 200 or less pupils, plus an additional acre for each additional 100 pupils or major fraction thereof. Burns' Indiana Rules & Regs., § (28–415)–3. As reflected in Figure 14, attached, only one of these schools meets acreage requirements. Most schools are grossly deficient in the space required— for example, the pupil density at School 66 is 544.21 pupils per acre, and is 493.57 per acre at School 42 and 481.33 per acre at School 73. By way of comparison, the pupil density at School 42, taking into consideration its enrollment and the State formula, should be 57.58 pupils per acre. It is thus overcrowded by 857.18%!

The evidence further shows that, with a few exceptions, the twenty-one schools in question are among the older schools in the IPS system—some dating back 100 years, more or less. Although there is no evidence that the Board of School Commissioners has not maintained such schools as well as could be expected under the circumstances, it is a fair inference, subject to further proof, that the type of construction, use of flammable materials, etc., would fail by a wide margin to meet safety standards for newly constructed schools. On the other hand, the evidence discloses that the school plants maintained by added defendant school corporations are, for the most part, relatively new and in compliance with acreage and safety standards.

On the basis of the foregoing facts, therefore, this Court would not feel justified in condemning out of hand a "one-way" suburban busing plan involving pupils from such of the twenty-one schools as may seem to the Board, on analysis, to afford inadequate educational plant facilities, viewed in the light of current standards. Additionally, such a plan would involve transportation of substantially fewer pupils, and therefore be less expensive.

Finally, unless convinced to the contrary by additional evidence in an appropriate hearing, this Court is not prepared to characterize busing as an unmitigated "burden." Although it might appear to a child to be "burdensome" to be derived of walking to school in the warm days of May and September (which presupposes that children do not like to ride in motor vehicles with their neighborhood friends—a somewhat novel concept to the Court), the Court doubts that it would seem such a burden to be transported in a heated bus through the rain, sleet, and snow so familiar in this latitude during other months of the school term. As pointed out in *Indianapolis II*, nearly 80% of suburban pupils (more than 80% since the elimination of Greenfield) are bused to school at the present time, without complaint.

The Court is not of the opinion that it would be wise to require transportation of kindergarten pupils, primarily because of their age, nor to transport special education pupils because of the various special problems which would inevitably arise in this regard. Further, the Court recognizes that special problems arise with respect to high school pupils, which might render their tranfer counterproductive once their high school training has begun. As to pupils in grades 1–8, however, the Court knows of no reason why transfer of pupils, in whatever fashion the General Assembly may elect, would not be reasonable and practical to accomplish the constitutional duty imposed by the Supreme Court, with the understanding, of course, that a transferred elementary pupil would thereafter routinely continue to be trans-

ferred to the same transferee school corporation for continued education through high school.

If, for example, transfers were made of Negro pupils from those of the twenty-one schools failing to meet modern standards to the schools of added defendants situate within the geographical area depicted in said Figure 1, all of those transferred would be afforded education in a desegregated setting. It should be no great task to desegregate the remaining school or schools within IPS. The Court estimates, based on the statistics and projections in the record, that it would be necessary for the suburban schools within such Figure 1 area, excluding the Washington Township and Pike Township schools, to accept transfer of IPS elementary pupils in grades 1–8 in number equivalent to approximately 15% of their 1973–74 enrollments in the same grades in order to accomplish this result.

After such transfers were accomplished, the racial percentages in each school to which transfers were made would be approximately 87% white and 13% Negro—a ratio which, by coincidence, would approximate that of the nation as a whole. As regards Washington Township, its minority percentage as projected for the present school year is already this high, so that general 1–8 transfers to this defendant would not appear to be indicated; however, the acceptance of pupil initiated transfers from IPS to its Everett J. Light Industrial Center, to the extent that vacancies exist, might well be required. Pike Township likewise has a substantial minority percentage at this time; however, a number of transfers sufficient to increase such percentage to a figure approximating that of the other suburban schools should be considered.

VI. *Costs and Mechanics of Transfers*

One advantage of the dual transfer system would be that if approximately equal numbers of pupils were transferred to and from suburban schools, tuition, transportation, and other costs would balance out as between IPS and the various other corporations, and no additions to school plants would be necessary. On the other hand, more pupils would be transported, thus increasing this total cost, and such a system would continue the use of the IPS antique buildings and grounds.

■ A one-way transfer plan would involve substantial tuition payments from IPS to the transferee schools. To the extent that such tuition applied only to the actual per capita cost of instruction, utilities, maintenance service, etc., no hardship would be imposed upon IPS, because it is apparent that IPS expense for such services would be correspondingly reduced. However, the present transfer law, IC 1971, 20–8.1–6–1 through 20–8.1–6–15, as amended, Burns' §§ 28–5001 through 28–5015, also contemplates charges related to the fair value of the transferee school plant, tax levies for building purposes, and other items related to capital outlay of the transferee school. Considering that the State of Indiana is itself at fault in this matter, as previously found, the General Assembly should consider whether the State should be required to contribute the necessary amount to compensate the transferee corporations for the use of their respective plants. Such a provision, with an appropriate formula, could be adopted as an amendment to the existing transfer law.

It is possible that the General Assembly could discharge its duty in this matter simply by amending the existing transfer law. The purpose of such law, as the Court understands it, is to permit the better accommodation of school children. As pointed out in Section III hereof, the Supreme Court of the United States has held that for a minority child to be compelled to attend a segregated school denies the Fourteenth Amendment rights of such child: in effect, the child is not properly accommodated. Therefore, if the transfer law were amended to recognize transfers to

accomplish desegregation of a school system which has been finally adjudged to have been segregated *de jure* (as is true in the case of IPS), a basis would be established for other necessary changes regarding time of payment of tuition, the share to be borne by the State, the matter of responsibility for and payment of the cost of transportation, and similar details. Since the actual number or percentage of pupils to be transferred is more of an administrative detail than a legislative function, this matter could be left to the discretion of the local school board or boards, subject to the approval of the court having jurisdiction of the case.

## VII. *Vacation of Certain Previous Orders*

The various orders contained in *Indianapolis II*, and heretofore stayed by the Court, requiring certain transfers of pupils from IPS to added defendants are each vacated and set aside. It should be understood, however, that the reason for this ruling is simply that it would be inconsistent to permit such orders to stand, although stayed, inasmuch as the General Assembly, in the exercise of its discretion, may desire to adopt an acceptable plan which would be inconsistent with such orders.

Moreover, the 5% order contained in *Indianapolis II* was designated as a mere interim order, it having been the Court's opinion that such amount of transfers would have been the most which could reasonably be expected to be accomplished within the limited time between the date of the order and the beginning of the 1973–74 school term. As it happened, added defendants were able to convince the Court that even this limited relief could not be accomplished within the time available, hence the stay. At this time the Court looks forward to a permanent solution to the problem of desegregating IPS, which will either come from the General Assembly, as it should, or from this Court in the event of legislative default. From what has been said herein, it should be apparent that the Court does not at this time consider 5% transfers as an adequate permanent solution. Indeed, if the solution is handed back to the Court by default, additional scrutiny will necessarily be given to complete consolidation along metropolitan lines.

However, by vacating its previous orders, it is not the intention of the Court to render moot the appeals now being prosecuted by added defendants. To the contrary, the Court is of the opinion that its conclusions of law as contained in *Indianapolis II*, as modified and supplemented herein, regarding the duty of the State to desegregate IPS, the State's power to adopt a metropolitan plan or transfer plan for such purpose, and the duty of the Court to promulgate such a plan in default of State action within the time presented, all involve controlling questions of law as to which there is substantial ground for difference of opinion, and that an immediate appeal from such rulings will materially advance the ultimate termination of this litigation. It is therefore respectfully suggested that the Court of Appeals determine said appeals on the merits, as provided in 28 U.S.C. § 1292(b).

Further, the Court in its previous order of July 20, 1973, *Indianapolis II*, entered the following: "All defendants who have not done so are directed to institute appropriate in-service training courses for their respective faculties and staff, and otherwise to orient their thinking and those of their pupils toward alleviating the problems of segregation." This order was not, and is not stayed, and neither is it vacated. It therefore remains as a continuing and final order, operating against added defendant school corporations, and accordingly does not appear to be moot.

[See following illustration]

INDIANAPOLIS

○ – 80-100% Black X – Closed

◻ – 60-80% Black Fig. 13

A.H.S. — Arlington High School
A.T.H.S. — Arsenal Technical High School
B.R.H.S. — Broad Ripple High School
C.A.H.S. — Crispus Attucks High School
E.M.H.S. — Emmerich Manual High School
G.W.H.S. — George Washington High School
H.E.W.H.S. — Harry E Wood High School
J.M.H.S. — John Marshall High School
N.H.S. — Northwest High School
S.H.S. — Shortridge High School
T.C.H.H.S. — Thomas Carr Howe High School
Kennedy Middle School

| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| 1 | 853 | 3.4 | 14 | 250.88 | 60.92 | 411.81 |
| 27 | 845 | 1.75 | 13 | 482.85 | 65.00 | 742.84 |
| 41 | 1157 | 3.0 | 17 | 385.66 | 68.05 | 566.73 |
| 42 | 691 | 1.4 | 12 | 493.57 | 57.58 | 857.18 |
| 43 | 811 | 2.6 | 13 | 311.92 | 62.38 | 500.03 |
| 44 | 1036 | 3.5 | 15 | 296.00 | 69.06 | 428.61 |
| 45 | 884 | 2.5 | 14 | 353.60 | 63.14 | 560.02 |
| 48 | 589 | 3.6 | 11 | 163.61 | 53.54 | 305.58 |
| 53 | 1068 | 10.0 | 16 | 106.80 | 66.75 | 160.00 |
| 56 | 655 | 1.7 | 12 | 385.29 | 54.58 | 705.91 |
| 60 ** | 1152 | 2.9 | 17 | 397.24 | 67.76 | 586.24 |
| 63 | 383 | 1.5 | 9 | 255.33 | 42.55 | 600.07 |
| 66 | 1034 | 1.9 | 15 | 544.21 | 68.93 | 789.51 |
| 71 | 1274 | 8.2 | 18 | 155.36 | 70.77 | 219.52 |
| 73 | 1083 | 2.25 | 16 | 481.33 | 67.68 | 711.18 |
| 75 | 793 | 1.75 | 13 | 453.14 | 61.00 | 742.85 |
| 76 | 594 | 1.5 | 11 | 396.00 | 54.00 | 733.33 |
| 83 | 496 | 11.0 | 10 | 45.09 | 49.60 | –9.10 |
| 110 | 1296 | 10.6 | 18 | 122.26 | 72.00 | 194.26 |
| Ken.* | 552 | 1.5 | 11 | 368.00 | 50.18 | .733.35 |

** School 60 and Mapleton-Fall Creek School
* Kennedy Middle School
A—Elementary Schools
B—September 1972 Enrollment
C—Acreage of School Site
D—Minimum State Required Acreage
E—Pupils Per Actual Acre
F—Pupils Per Minimum Required Acre
G—Percent Overcrowded

Fig. 14